Our first case of the morning, 410-0677 in re the Marriage of Kristina Smithson, for the appellant, Ms. Gordon, for the appellee, Mr. Hopp, you may proceed. May it please the court, counsel. My name is Kelly Gordon, and I represent the appellant, James Smiths. Today I present two issues to this court. The first, the court erred in denying James' motion to modify paucity, and the second, the court erred in finding James in contempt of court. A brief history of the facts. James and Kristina were married on March 7th in the year 2000. They had two children, Jacob, who was born in July of 2000, and Ryan, who was born in May of 2003. The parties were divorced in November of 2004, at which time they entered into a joint parenting agreement. The joint parenting agreement provided that James, who was living in California, would have visitation during the summer and alternate Christmases. Prior to the parties' divorce, they resided in California. When James was deployed, he helped Kristina move back to Illinois. When he returned from his deployment, he went back to California, and that is when the parties got divorced. On January 25th of 2008, James filed his motion to modify custody. In order to modify custody, the petitioner must prove by clear and convincing evidence that one, there has been a change of circumstances, and two, that a modification of custody would serve in the best interest of the children. The standard of review on a motion to modify custody is abuse of discretion. In the case at Barr, the court did abuse its discretion in denying the motion to modify custody. The first prong, having to prove a change of circumstances, had been met. In both the cases of Lasky and Ricketts, the courts found in those cases that if the parties both agreed that they could not jointly parent the child, the children in this case, then the change of circumstance element had been met. In fact, they said that if they couldn't joint parent Ricketts, they would just eliminate that requirement altogether. And in this case, James filed a motion to modify seeking sole custody, and at least three times during the trial, Kristina agreed that the joint parenting agreement was not working. Also, the court did modify custody, therefore must have found that there had been a change of circumstances. Once that change of circumstances is found by clear and convincing evidence, the court then moves to a best interest standard. And I have laid out in my brief all of the factors and gone into detail with each. I just want to highlight the points here today. The first factor that I think the court should look at and that the trial court should pay more attention to is the domestic with regards to, is the issue of physical violence or threats of physical violence in the home. In the case at Barr, there was testimony elicited and admitted to by Kristina that there had been physical violence in the home with the children present. Kristina had been married six times. The third time was to James. And then after her and James were divorced, she married Brad Ball. Her marriage to Brad Ball lasted only six weeks. They were together, though, for approximately a year, a little under a year. During this relationship, she told James and she admitted at trial that she had told James that Brad Ball had shaken Ryan on one occasion. She had also acknowledged that while the children were present in the home, Brad Ball had kicked the wall out of anger and also kicked a door and punched a hole through a door out of anger. All this occurred while the children were present in the home. After her marriage to Brad Ball, she then married Jonathan Campbell. At the time of the trial, her and Jonathan were going through a divorce. Again, with Jonathan Campbell, more physical violence in the home with the children present. She even wrote in her diary regarding a fight she had with Jonathan. I'll just pull out the important part. She stated in her diary, in her own words, Jonathan then continued yelling and finally saying, you're an effing liar. And I, Christina, punched him in the arm. Just a note, semicolon. The boys were in the bathroom with us and we were watching Kung Fu Panda when Jacob heard Jonathan yell at me and went to Andrew's room to tell him. Jacob told Andrew that Jonathan was being mean to me and that Jonathan used the F word. The boys and me packed up and went to Mom and Dad's house before everything escalated. Andrew was Christina's older son from another relationship. Again, she's admitting in her diary that this abuse is occurring with the children present. She also, during trial, testified a couple different times and also Dr. Appleton did a psychological evaluation and told Dr. Appleton a few different stories with regards to how many times she had to pack up the kids and leave the house because of the fights she was having with Jonathan. Somewhere between 20 and 60 times she would have to leave the house because she said if she didn't leave the house she was afraid the argument would continue to escalate. Just like in the case in her diary where she ended up hitting Jonathan in front of the kids. During these 20 or 60 times that she left the house, she would even have to leave in the middle of the night, pack the kids up, wake them up, sometimes on school nights. Andrew, the older child, even testified that maybe that did affect him at school the next day. With the little kids at issue here, they had school the next day yet she's tearing them up out of bed to go to her Mom and Dad's house and then returning to James either the next day or a few days later. Dr. Appleton, in her report, even says how stressful and chaotic this home is. In her report, she suggests that the kids do move to California and be with James. So even Dr. Appleton is showing that the stress on the kids, the physical abuse in the house, the waking up in the middle of the night, having to leave, having to go to her parents, and then having to come back again to the same person that the kids had already seen yell at their Mom, their Mom hit him. And Dr. Appleton even said that it's not good for the children to have to be afraid and have to be the protectors of their own Mom in their house. There is also the stability component and Christina has shown that she hasn't been stable. Again, like I said, she went through, she's gone through six husbands, two just after the divorce, so two twice married in the middle of a divorce since 2004. Even the GAL that was appointed in this case, he who found that the children should stay with Christina, in his report he even states that Christina's life has been a train wreck. The physical abuse, the marriages, the divorces, simply not good for a child. These factors all weigh in favor of James having the children. Then we look at the relationship between the parents and the siblings. There's additional siblings in each home. In Christina's home, at the time of trial, there was an infant that had just been born and then there was the older child, Andrew, who was getting ready to go off to college. At Dad's house, his new wife had two children, ages approximately 13 and 15, so a little closer in age. And Dr. Appleton found, she did two reports in this case. She did one that ended up not necessarily having a resolution because she, throughout the course, James was getting more information and some of the reasons that he filed a motion to modify to begin with was because he wasn't receiving some information about schooling and medical visits. It looked like that just him filing the motion to modify helped that along. However, as things progressed, Dr. Appleton ended up doing a second report and changing her findings and finding that the children should go with James. And one of the reasons for that was because she found that there was an unhealthy relationship between the children and Christina. Dr. Appleton noted that when kids come to see her during a psychological evaluation, they may cry the first time. In this case, Jacob cried every single visit. Dr. Appleton attributed this to, potentially, she found out that Jacob and Ryan had been told what to say to Dr. Appleton. This would lead to stress and would potentially lead to them crying every time they came because they didn't know they were being told what to say to Dr. Appleton. So they were scared that maybe they would say the wrong thing and this would cause the children to be upset. And also, Christina allowed Andrew to build a works bomb. I laid out in my brief what a works bomb is. You may have seen it on the news. It's a big thing with high school kids right now. Christina was there and watched her son build a bomb. She allowed her other two little kids, the kids that issued this case, to watch Andrew build a bomb and then throw the bomb at the school football field. And again, the trial court had Andrew testify. During Andrew's testimony, Andrew was asked twice, what were the little kids doing? And he said, me and the little kids would run away when he threw the bomb. And the bomb is some sort of bottle with fluid in it and foil balls. And you shake it up and throw it and it explodes. And Andrew said that he and the boys would run as fast as they could away. And keeping in mind that Dr. Appleton now has already found that these kids are being coached. So there's this testimony of Andrew in court. Later, when the trial judge interviews the two kids in an in-camera interview, the story with those little kids changes. Now the little kids opposed to Andrew who said that he and the little boys would run away as fast as they could when he threw it. The little boy, Jacob and Ryan, one of them said that they were in the other room playing video games. Another one said they were inside watching through, I believe it was the sliding door. So if you put that in context of what Dr. Appleton has already said and that these children are being coached, it looks like that maybe happened again even with the in-camera interview. It's her putting these kids in a situation where they don't know reality. They know what their moms tell them and they know what the truth is. And they're getting mixed signals from their mother of what's right and what's wrong. Causing such as when they go to Dr. Appleton or anyone else, they're afraid because they don't know what they're supposed to say. They don't know what they're supposed to do. This is the environment that their mother is putting them in. There was also, Dr. Appleton also talked about the sentence stems where you start a sentence and finish it. And the kids, when they went back to Dr. Appleton one other time, said how they had been practicing that with their mom. So again, coaching going on. Also, their mother putting them in an environment that's not healthy. When she was with John Campbell, she admitted that she would have the kids, Jacob and Ryan, sleep in the same room on the floor when her and John, Jonathan, were in bed together. Potentially having relations. Even when asked at trial, do you think this was good for the kids? She admitted no. Was this in the best interest of the kids? No. Christina's admitting that what she's doing is not good for the kids. Jonathan, before she married Jonathan, she wrote an email to Jonathan wanting to break up with him. An email in November. The November before they got married. Saying that I need to start putting my focus back on my kids. I shouldn't be out with you at night. I shouldn't be out drinking with you at night. I need to put the focus back on the kids. It looked like maybe at that time she was going to do that. Two or three months later, she married Jonathan. So the focus was not put back on the kids. Instead she went back into the relationship with Jonathan. And ultimately married Jonathan. The coaching, the physical abuse in the house, all leads to the kids having anxiety and fear. And the kids did say during the in-camera interview... Dr. Appleton is an expert. Correct. Yes. Did she say that the children were anxious and fearful? She did. And that contributed to how they were performing in school or otherwise? The kids are performing okay in school. One of them is getting good grades. The other one, however, the little one is having problems reading and was going to be held back. Dr. Appleton did not necessarily attribute those two things. But Dr. Appleton did say that the coaching was leading to anxiety and fear in the children. And to exactly tell whether that was the cause of some of his learning disabilities, we're not sure. Dr. Appleton did extensive tests on both of the children as well as the school. And they came up differently. The school was saying that he was doing well, that he had met at school. Dr. Appleton did not find that. And one of the things that Dr. Appleton did find was that she believed that the school was being biased against James. Christina's stepfather works at the school. Throughout the kids going to the school, James had tried to get information from the school. It wasn't getting it. There were emails being sent that then were not given to James or were being hidden from James. And that was one of the things Dr. Appleton saw of why she thought the school was being biased. It was because James wasn't getting the same information that Christina was. Even when James called the school and talked to them about whether or not the kids were seeing a psychologist, the school told him no. Dr. Appleton found that to be incredibly uncanny of the school. Because although the kids weren't seeing a psychologist, they were going to counseling. And the school didn't even tell him that. And Christina didn't even tell James that... Was it counseling at school? Counseling at school, yes. That Ryan had an individualized educational plan, an IEP. Christina never told James that. It was over a year before James found out about the IEP. And when he found out about it, he was talking to people involved with the school. And when he was having speech problems. When you also look at the adjustment to the home and the school and the community, again, having problems with school, maybe failing school at the time of trial. They weren't sure if they were going to hold Ryan back into first grade. And the repeated problems with information getting to James also leads to that factor being in favor of James. Because James should be able to be getting information from the school, knowing about the programs from the school, knowing what's going on. Ryan was supposed to be in speech therapy class. Christina went six months without being in the class. He has an IEP, so he's allowed to get all these services. Christina simply was not following through in getting the services that the kids needed. And if James hadn't filed the motion to modify when he did, none of this maybe could have even been brought up. It was because of James that he started getting the services. And even during this period, there were six months where he didn't get services. If you also look at their dental hygiene, again, extensively in my brief, these kids, they weren't seeing a dentist. They went, I believe it was 15 or 16 months without seeing a dentist at their age. He gets, James gets the kids in California, and one of them has to be taken immediately to the emergency room to have a root canal done, because his tooth was rotted out. He then gets one tooth, he gets that tooth, the root canal, and then another one filled, and tells Christina, he has got another cavity, you've got to get it filled. She waits six months for that cavity to be filled. So you've got a little boy eating food, probably sweets, and having an open cavity in his mouth for six months before she gets around to taking him to the dentist to get it fixed. As far as fostering a relationship, Dr. Appleton even found that she didn't believe that Christina would continue to foster a relationship. She hadn't shown that she had done it in the past, and probably wouldn't do it in the future. Again, not telling James about an IEP, not informing James of what's going on in school, not informing James of services that the kids would be entitled to, not telling James about certain events. For Daddy's Day, James may have not have flown all the way from California to be here with his child for Daddy's Day, but just not even telling him about it. At least give him the opportunity to know about it, maybe call his kid in the morning and say, hey, sorry I can't be there for you, but, you know, I'm with you in spirit. She's not even telling him any of these little things with school. Dr. Appleton did find that James had a healthy relationship with the kids. She did find that James would foster a relationship with Christina. Ultimately, though, Dr. Appleton found that because of the insecure relationship that the kids had with Christina, the kids should live with James in California. My next issue is the contempt issue. The court found that James was in contempt of court for failing to pay medical bills. The original order provided that each parent would pay for insurance for the kids, and then they would split uncovered medical expenses. Normal provision. However, at some point, Christina and James agreed that only one parent would need to pay for the health insurance. James's understanding was that one parent would pay for the, he would pay for the insurance, and Christina would pay for all the uncovered medical expenses. Now Christina later says she remembers that she didn't have to pay for health insurance anymore, but doesn't remember the part about her... Regarding the contempt, what relief are you requesting? Just that he not be held in contempt. He was ordered to pay attorney's fees. I don't believe he should have had to pay attorney's fees in that matter. Oh, he was also ordered to pay the... The one half of medical expenses. So my relief in that would be that it was his understanding that since he was paying, he shouldn't have to pay the medical bills. And going forward, if the court doesn't take that oral agreement into account, that going forward, pay half of the medical bills. But it's his understanding since he was paying for the insurance, he wasn't going to be held in contempt of court, and these people had their own side agreement, but never had it formalized with the court. But what would a court do? You'd say, you don't get to make agreements with each other. You've both been in court enough that you know you're supposed to have it formalized. So why should the medical expenses be treated differently? I don't believe he should... I mean, even his understanding... Let's talk about the dollars. Why should that be treated any differently? Presumably, it should not, Judge. But he should not be held in contempt of court. Thank you. Mr. Hoppe. I am Richard W. Hoppe. I represent the Appalachian formerly Christina L. Smithson. With respect to this case, I'd like to talk a little bit about the law to start with. We have a petition to modify custody that was filed by Mr. Smithson. And there was a response filed to that petition, and it denied that it was in the best interest of the children to modify custody. Further denied that the joint custody arrangement should be terminated. The only other petition filed in this case was a contempt of court petition for the medical expenses. Now, when we look at 610B and we look at burden of proof, which is where I want to go to start with, we look at that and say that you have to prove as indicated by counsel, the change of circumstances and also the best interest, all by clear and convincing evidence. The exception to that is where the parties agree to a termination of custody. I don't think by the wildest stretch of imagination in this case that one can suggest that there was an agreement to terminate joint custody. We look at the two cases that have come up on that issue, and we look at Lasky and Ricketts. And of course there wasn't a formal stipulation or agreement to modify or change joint custody, but both parties had filed petitions saying joint custody was not working and requested a modification. In that instance, the court said, sure, you don't need a formal agreement. Here, the only thing that we have is some equivocal testimony which starts off on cross-examination. All you folks who have been lawyers down at my side of the bench and have had witnesses on the stand, you know on cross-examination you're going to answer that question or you're going to be told by the trial judge, don't elaborate, you can come back and your attorney can clarify it if so desired. And there is in the brief, particularly on Mr. Smithson's side, that the former Miss Smithson said, was joint custody working? No. And that's set out. Now of course I set out my brief when I clarified that. What she said is I am not joint parenting with Mr. Smithson. I'm joint parenting with Julia Smithson, his wife, and that's not working. In fact, she then testified that in order to joint parent with Mr. Smithson she quit the email, and you can look at your record, you've got piles of the things, and went to verbal communication. And that was working. Now, did the judge find that it wasn't working? Sure he did. He put right in his court order that he said that over the period of time these parties had not communicated as they should. Mr. Smithson did not really discuss but dictated and belittled the choices made by Mrs. Smithson. That was the court order but that's certainly not what the statute requires to drop us down to a best interest standard. So I think the court properly decided this case by clear and convincing evidence. In terms of the decision itself, we've heard a lot of discussion of the facts, and I think that the standard on review of use of discretion contrary to the manifest weight, I've set out a whole series of cases, the Craig case and what have you, great deference is given to the trial judge and his ability to look at and listen to witnesses and determine credibility, and that all inferences should be toward the benefit of the trial judge's decision in this case. I think if you read the appellant's brief, you'll even find that Mrs. Smithson presented witnesses that said she was doing very fine, and in fact all of the witnesses said that. Let me go back a little bit on what was said, though, on the facts and talk about that a little bit. We talk about stability, and one of the things we look at is where people were living. Well, Mr. Smithson went away on that deployment. He never contacted his wife during the entire time that he was gone. He was in Iraq, I believe, for nine months. He called his kids once, he communicated with his father, he limited the stipend from his income to the bare minimum the military would allow and sent the rest of the money to his father, and his father kept it for him. Mrs. Smithson did not get any other help. When he came back, he stayed in California. Mrs. Smithson, to get some help from her family, some support, moved back to home, Illinois. That's where they met, that's where they married, and that's where they were living to start with. Now, did he come back to Illinois? No. Did he contact her? No. She found out he was back by talking to mutual acquaintances. I believe it was a cousin, but I'm not sure on that. Did he tell her where he was in California? No. In fact, the address that he gave her he testified to was a lie. He didn't want her to know where he was. He even said in the communication, the limited communication he had, I don't want a family. Did he stay in California? No. He moved to Florida. Even his father at that point did not have an address for him, did not have an address until he took the kids down to visit Mrs. Smithson in Florida a year later and he only had a cell phone number. He found the address, eventually, and then ultimately Mr. Smithson at some point moved back to California. His mother bought a house, rural community, rural school district, lived there for the last five years, then married one more time than Mr. Smithson. We have some testimony by Brad Ball, they were actually married five weeks, not six, they lived together after the marriage. Mr. Ball could remember what they ate for dinner but could not remember the date of birth of a child that he had born after the marriage to Mrs. Smithson. I think credibility comes into account here. If you listen to what he said, the trial judge had the opportunity to do that. You listen to the other witnesses by, that were presented by the court, or to the court, and we have Cherie Flanagan. Cherie Flanagan is the school psychologist. I'm not sure about this because I don't recall that in the testimony. Cherie Flanagan was performing tests, performance tests, same tests that Dr. Appleton did. Dr. Appleton's test results were lower than Cherie Flanagan's. Now Cherie Flanagan is a lady who is a certified school psychologist, bachelor's degree, master's degree, professional education, serves on a number of boards, has been the head of Arianna for 14 and a half years. You might want to note from the record Dr. Appleton said, even though she did say at one point we think the school is biased against Mr. Smithson. I'm not sure how she reached that conclusion because she never talked to any of the teachers. She didn't talk to the school psychologist. She didn't talk to any of these people. They weren't in session during the summertime when she did her first report or at Christmas break when she did her second report. She got that from James Smithson. He thought they were biased. But I guess she decided that he was right. But in any event, what she did say, Cherie Flanagan in her opinion was not biased against Mr. Smithson or in favor of Mrs. Smithson. She was not employed by the school district. She was employed by the Macon-Piatt Special Education District and did not feel she was biased. Cherie Flanagan appeared on the witness stand and testified yes, my scores were higher. She said you know, that certainly is possible under the circumstances and the circumstances are that you take a child you take them over to an office with Dr. Appleton where the child is not familiar with it, out of their realm so to speak they're uncomfortable. They may not test as well. When you take the child into the school situation where I tested the child the child was comfortable, worked, and the scores were better. Did Dr. Appleton ever call, contact Cherie Flanagan to try to reconcile this? No. But that was the explanation given on the witness stand. Could the judge have believed that? Certainly. The judge is the judge of credibility. When we look at Dr. Appleton, what did she do? How did she make a report? I don't mean to criticize her. I use her in other cases and I respect her. And I'm not saying that. I'm just saying in this particular case, we did not talk to the school psychologist. We did not talk to any of the teachers. These are the folks that are with these kids five days a week, 180 days of the year. Best opportunity to observe them. They didn't testify as to any social relationship to Miss Flanagan. They didn't testify. It was purely a school relationship. By the way, we hear all about this instability and all about how we're guessing that these kids are upset, anxious, and what have you. None of the teachers, the people who worked with the IEP, or any other witness presented that saw these kids on a daily basis observed any problems with them behavior or otherwise. Now, there is in the record a reference, and Dr. Appleton got upset because the mother didn't tell her about this, where she received an email where the kid, one of the boys, I think it was the youngest child, had hands on another child, maybe even struck the child, I'm not sure. The mother said, well, I didn't think it was important because it was a one-time or limited deal. It was taken care of and it didn't happen again. Every witness that testified verified that. In fact, I think the closest you came to it was a first-grade teacher who said, yes, the child has had his hands on other students, but no more than any other of my other students or no more than any other student of the age of this group. No difference. They were well-behaved, well-dressed, well-fed. The dentist testified that based upon their teeth and their observations, they had good dental care. He could not see from evaluating it that they had an overabundance of sweets. Their diet appeared to be good based upon what he was able to observe. Now, we heard about this 16-month deal. That was a really interesting question because not, it is true that they went 14 or 16 months. One child, the other child had an appointment. If you look at the records from the dentist that were produced, both children were always examined at the same time. Unfortunately, we could not remember why on that one occasion that the oldest child did not get to the dentist. Whether it was because of a conflict or illness, nobody could remember. Hence, the record doesn't contain the information. The child in question, the oldest child, saw a doctor called a matter of a couple of days before he went to California. Dr. Cole said the problem was a tooth coming in. That is why the child was having pain. Gave fluoride and I believe Tylenol and said give the child this. Well, when they got to California, it continued to hurt. They took the child to the dentist. They had a root canal. Dr. Osborne testified. He was the only dentist we had that actually appeared and testified as an expert witness. He is clearly an expert witness, but that is not unusual. We do this routinely for children. They have soft teeth. Their enamel is soft. Oftentimes, we'll do a root canal. We'll put in a stainless steel cap. Just if there is a decay in one tooth, we'll put a stainless steel cap on the next one to prevent the decay. He specifically asked whether 16 months, could he say with a reasonable degree of certainty within his profession that that caused problems with the child. No. He said no, I can't say that. Was it unusual or unreasonable for the child to go six months after the return from California? I think the appointment was in December. The child came back sometime in July or August before the next appointment. He said no, that's not unreasonable, not unusual, and it would not have hurt the child. He said the last several years that I've had these children, the mother has taken care of them very well. So, I think you can look at the evidence. You can pick and choose what you want to hear, what you want to see, but you can't judge credibility based on a transcript. You can't judge credibility based upon the record. If you look through that record, and what I've tried to do is follow what I believe I'm supposed to do with the appellate court briefs, not argue the facts, you know, in my brief is to tell you what the law is and set the facts out in the statement, which is what I've tried to do. I have put in a rather substantial supplemental statement of facts which sets out other facts which I believe that you should take into consideration. But I believe that there is certain, was, substantial evidence to support the trial judge's decision. Did he terminate the custody? It's not an issue that was raised on the appeal. I looked it up a little bit, and I firmly believe a judge has, what we used to call sui sponte, the ability to change things when he didn't think they were working very well. A four-day trial would indicate things weren't working very well. Let's change it. And he did. I don't know that that's terribly significant other than for the parties themselves. On the contempt issue, one side said there's an agreement, one side there wasn't. If you believe either side, then perhaps you have contempt or perhaps you don't. The judge believed the side that said there was contempt. And also look at the fact that there was no petition to modify the provisions of the Medicaid. Did your client maintain medical insurance for the children in accordance with the settlement agreement? She did for a period of time. My recollection, she was working at EDM corporate offices at that period of time and thereafter lost her employment. And I believe it is required that she maintain it through her employment. At the time that these proceedings were ongoing, Ms. Smithson was not have insurance available to her. Why is the contempt finding necessary? Why can't the court just order reimbursement of medical expenses? I suppose the trial judge could have ordered that. I mean, I don't have any basic disagreement with that. I will say that there are emails that go back and forth that were presented as evidence where the contempt petition was filed, I'm of 2009. The decision wasn't rendered until the following summer in 2010. There are emails after that basically saying, tell me how much I owe you and I will pay you from Mr. Smithson. And I've set those up. No money was ever paid. He certainly had a sufficient time to do that to say, okay, we don't have an agreement. I haven't asked for a change. But he never made the payment. And there's pending right now a petition on that for sanctions. I'm just saying the judge could have done that. He certainly could have because as was pointed out by Judge Kinect, there is no change in the order. There was none ever requested. Why would you not expect that that order is not still in effect? I agree with that rationale. Any questions? We do not. Thank you. First time I've been in this room. In fact, I went over to the other building and was told I was in the wrong place. I'm glad I started a little early this morning. Rebecca. I have a question with respect to this contempt issue. When Justice Turner asked you, or maybe it was Justice Kinect, what remedy are you asking for? And you mentioned the attorney's fees. Let's say that Mr. Hopp in the court order, without a finding of contempt, wouldn't they still be allowed to have attorney's fees? If they bring an action to enforce the court order and it's found that your client wasn't in compliance, whether it was willful or not, I think it's under 508, I don't have the statute in front of me, but aren't they still entitled to attorney's fees when they bring an enforcement proceeding? Judge, off the top of my head, I'm not sure about that. The problem on appeal, as Kinect brought up, the agreement was the agreement that was laid up Brecker, that was incorporated into the settlement agreement. And then to come back and try to make a finding of contempt when he had what we believe is a good faith basis of not paying it, that he should not have been found in contempt, it was arising out of that. I guess I'm just getting at what difference does it make ultimately if strictly if by bringing an enforcement action she'd be entitled to attorney's fees whether there was a finding of contempt or not. I guess what the court would have to look at is whether or not he believed that that agreement was still a valid agreement. Okay, let's say he did believe, let's say a court found that, that he really believed they had modified the agreement. But that it was not effective with binding on the court and that she had the right to bring an enforcement action to get her half of the unpaid bills paid. What I'm saying to you is I think she's still entitled to attorney's fees. Now I don't have the statute with me so I don't want you to hold me to it and not check it, but if she's bringing an enforcement action, whether or not there's a finding of contempt, I think the court still has the ability to give her an award of fees for that. And I would have to look at 508 too just because I didn't lay that out in my brief so I'm not necessarily familiar with that, but I do understand what you're saying. With regards to the children's dental care, I believe the testimony was that it was adequate dental care. As the court knows this was a four day trial so if I'm wrong on that word I apologize, but I believe it was adequate dental care. And as for when they exchanged the child, which I believe was at Dr. Appleton's office right before he got the root canal, Christina did give James some fluoride and some Tylenol. And when James got to California he looked, the fluoride was a couple years old and I believe it was for the other child. It wasn't for the child that was having the problem. So she's giving him medicine that's for the wrong child and that's old. As far as credibility, I believe counsel's correct. The lower court is the one that makes the decisions regarding the credibility of the witnesses. However, in this case that would be the same. But if you just look at her, Christina's testimony, she admitted a lot of the things that I had brought up to you in my opening. She admitted to all the physical violence. That wasn't a credibility decision to be made by the court. She admitted to the physical violence. She admitted that all of her husbands did violence. Now with James she didn't say that there was physical violence. She admitted to that. She admitted to taking the kids out of the home at least 20 times while she was with Jonathan. And some of those times being during the night times and on school times. She admitted to the kids observing the physical violence with Brad Ball. She admitted that they were nervous. She wrote about Jonathan in her diary. She admits it's not a credibility This court doesn't have to decide what the credibility is. The court can just look at the admissions that she made throughout the trial about the problems. After the petition was filed and then leading up to the four day trial and then over the course of the trial, was there evidence about Ms. Misman or Ms. Campbell's relationships at that point? Was she in a relationship? Yes. She was in a relationship at that time. She talked to Dr. Appleton about the relationship. She told Dr. Appleton that everything with Jonathan was fine. And then later Dr. Appleton also found out that that was not the case at all. That that relationship was not fine. And in fact by the time she got to trial they were in the middle of the divorce. Jonathan in fact testified on behalf of what we call Jonathan as a witness in our case. And did he talk about violence? Yes. He had talked about some of the violence that had occurred in the home. Thank you.